

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

JOHN B. SCHRADER,                    )      No. ED CV 14-961-PLA
                                     )
                Plaintiff,           )
                                     )
        v.                           )      **MEMORANDUM OPINION AND ORDER**
                                     )
CAROLYN W. COLVIN,                   )
ACTING COMMISSIONER OF SOCIAL        )
SECURITY ADMINISTRATION,             )
                                     )
                Defendant.           )
_____)

**I.**

**PROCEEDINGS**

Plaintiff filed this action on May 23, 2014, seeking review of the Commissioner's denial of his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on June 11, 2014, and June 16, 2014. Pursuant to the Court's Order, the parties filed a Joint Stipulation on February 19, 2015, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on September 10, 1960.  [Administrative Record ("AR") at 16, 164, 171.]  He has past relevant work experience as a property manager.  [AR at 16, 44.]

On July 11, 2011, plaintiff filed an application for SSI payments; on September 17, 2011, he filed an application for a period of disability and DIB.  [AR at 164, 171.]  In both applications plaintiff alleged that he has been unable to work since June 6, 2010.  [AR at 9, 164-70, 171-79.]  After his applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 9, 110-12.]  A hearing was held on January 9, 2013, at which time plaintiff appeared represented by an attorney, and testified on his own behalf.  [AR at 25-49.]  A vocational expert ("VE") also testified.  [AR at 44-48.]  On January 28, 2013, the ALJ issued a decision concluding that plaintiff was not under a disability from June 6, 2010, the alleged onset date, through January 28, 2013, the date of the decision.  [AR at 9-19.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 5.]  When the Appeals Council denied plaintiff's request for review on March 19, 2014 [AR at 1-3], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation

1   and quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same).

2   When determining whether substantial evidence exists to support the Commissioner's decision,

3   the Court examines the administrative record as a whole, considering adverse as well as

4   supporting evidence.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted);

5   see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must

6   consider the entire record as a whole and may not affirm simply by isolating a specific quantum

7   of supporting evidence.") (citation and quotation marks omitted).  "Where evidence is susceptible

8   to more than one rational interpretation, the ALJ's decision should be upheld."  Ryan, 528 F.3d

9   at 1198 (citation and quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880,

10  882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion,

11  [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

12

13                                          IV.

14                        **THE EVALUATION OF DISABILITY**

15          Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

16  to engage in any substantial gainful activity owing to a physical or mental impairment that is

17  expected to result in death or which has lasted or is expected to last for a continuous period of at

18  least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

19  1992).

20

21  **A.      THE FIVE-STEP EVALUATION PROCESS**

22          The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

23  whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

24  828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must

25  determine whether the claimant is currently engaged in substantial gainful activity; if so, the

26  claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

27  substantial gainful activity, the second step requires the Commissioner to determine whether the

28

                                                 3

claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy.  Id.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

## B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 6, 2010, the alleged onset date.[1]  [AR at 11.]  At step two, the ALJ concluded that plaintiff has the following severe impairments:

> [S]ymptomatic post open reduction internal fixation (ORIF) left acetabulum and hemipelvis; left foot drop; per[o]neal[2] nerve injury ; greater trochanteric bursitis of the left hip; [and] left spine degenerative disc disease.

---

[1]    The ALJ concluded that plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015.  [AR at 11.]

[2]    The medical records reflect plaintiff suffers from "peroneal" nerve injury, an injury that results in foot drop.  [See, e.g., AR at 14, 244, 272]; see also http://www.webmd.com (last visited March 10, 2015).

1   [Id.]  At step three, the ALJ determined that plaintiff does not have an impairment or a combination

2   of impairments that meets or medically equals any of the impairments in the Listing.  [AR at 12.]

3   The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform

4   light[4] work[5] as follows:

5           Specifically, the claimant can lift and/or carry 20 pounds occasionally and 10 pounds
            frequently; he can stand and/or walk for six hours out of an eight-hour workday, but
6           no longer than 30 minutes at any one time; he can sit for six hours out of an eight-
            hour workday but not more than 30 minutes at a time; the claimant can occasionally
7           climb ramps and stairs, and is precluded from climbing ladders, ropes or scaffolds;
            the claimant is limited to occasional bending, stooping, kneeling, crawling or
8           crouching; the claimant should avoid even moderate exposure to vibration or
            hazardous conditions.
9

10  [Id.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that

11  plaintiff is capable of performing his past relevant work as a property manager as generally

12  performed.[6]  [AR at 16, 44-45.]  The ALJ made the alternative finding  at step five that based on

13  plaintiff's RFC, vocational factors (including transferable skills acquired in plaintiff's past relevant

14  _____

15      [3]   RFC is what a claimant can still do despite existing exertional and nonexertional

16  limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
    three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which

17  the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
    1151 n.2 (9th Cir. 2007) (citation omitted).

18
        [4]   Although the decision states that plaintiff "has the [RFC] to perform sedentary work," and

19  "claimant's additional limitations do not allow [him] to perform the full range of sedentary work,"
    the description of plaintiff's functional capacities appears to reflect a reduced range of light work.

20  [AR at 12.]  The Court assumes that the references to sedentary work were the result of clerical
    error.

21
        [5]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of

22  objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this
    category when it requires a good deal of walking or standing, or when it involves sitting most of the

23  time with some pushing and pulling of arm or leg controls.  To be considered capable of performing

24  a full or wide range of light work, you must have the ability to do substantially all of these activities.  If
    someone can do light work, we determine that he or she can also do sedentary work, unless there are

25  additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20

26  C.F.R. §§ 404.1567(b), 416.967(b).

27      [6]   Plaintiff actually performed his past work as a property manager at the medium exertional
    level.  [AR at 16, 44.]   It is generally performed at the light exertional level.  [AR at 44.]

28

1   work), and the VE's testimony, there are sedentary jobs existing in significant numbers in the

2   national economy that plaintiff can perform, including work as a "Billing Clerk" (Dictionary of

3   Occupational Titles ("DOT") No. 214.362-042), "Order Clerk" (DOT No. 249.362-026),

4   "Appointment Clerk" (DOT No. 237.367-020), and Data Entry (DOT No. 203.582-054.) [AR at 17-

5   18, 47.]  The ALJ also found, based on the testimony of the VE, that plaintiff can perform the light

6   occupations of "Mail Clerk" (DOT No. 209.687-026), "Housekeeping" (DOT No. 323.687-014), and

7   "Cafeteria Attendant" (DOT No. 311.677-010).   [AR at 18, 45-46.]   Accordingly, the ALJ

8   determined that plaintiff was not disabled at any time from the alleged onset date of June 6, 2010,

9   through January 28, 2013, the date of the decision.  [AR at 19.]

10

11                                                    **V.**

12                                         **THE ALJ'S DECISION**

13            Plaintiff contends that the ALJ erred when she:  (1) found that plaintiff did not meet or equal

14   Listings 1.02, 1.03, or 1.04; and (2) gave the opinion of plaintiff's treating physician, Cynthia Soto,

15   M.D., only "some weight."  [Joint Stipulation ("JS") at 3.]

16            As set forth below, the Court agrees with plaintiff, in part, and remands for further

17   proceedings.

18

19   **A.     LISTINGS 1.02, 1.03, AND 1.04**

20            At step three of the evaluation process, the ALJ must determine whether a claimant has

21   an impairment of combination of impairments that meets or equals a condition outlined in the

22   Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).  "An ALJ must evaluate the relevant evidence

23   before concluding that a claimant's impairments do not meet or equal a listed impairment.  A

24   boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do

25   so."  Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001) (citing Marcia v. Sullivan, 900 F.2d 172, 176

26   (9th Cir. 1990)).  "To *meet* a listed impairment, a claimant must establish that he or she meets

27   each characteristic of a listed impairment relevant to his or her claim.  To *equal* a listed

28

impairment,[7] a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment . . . ."  Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999) (quoting 20 C.F.R. § 404.1526) (emphases in original) (footnote added); see also 20 C.F.R. § 416.926(a).

Plaintiff contends that the ALJ erred in her consideration of whether plaintiff meets or equals Listings 1.02, 1.03, and 1.04.  [JS at 3-16.]  He also contends that the ALJ's boilerplate finding, i.e., that "[t]he evidence does not support a finding that the claimant has the severity of the symptoms required either singly or in combination to meet or equal any medical listing, including those found under 1.00 . . . ," is insufficient "and not even specific as to Listing 1.02, 1.03 or 1.04 . . . ."  [JS at 4.]

### 1.    Background

Plaintiff was hit by a motorcycle while filming a motocross event on June 6, 2010.  [AR at 14, 33-34.]  He suffered a left pelvic fracture and third metacarpal fracture.  [AR at 14, 230, 241, 274, 284-85, 474-79.]  Although he had a normal x-ray of his left femur, EMG testing showed severe left peroneal nerve injury at the hip level.  [AR at 14, 244, 473.]  Plaintiff underwent incision and debridement of the left hand at the open fracture site, open reduction and internal fixation of the left third metacarpal, placement of a Steinman pin for skeletal traction, closed treatment of the left acetabular fracture, and closure of the laceration, 1 cm in length, at the left finger proximal phalanx.  [AR at 14, 234, 333, 391.]

From June 2010 through July 2011, plaintiff treated at San Bernardino Medical Group.  [AR at 264-315, 322-558.]  On June 20, 2010, and June 28, 2010, he presented in a wheelchair, "but came in with his walker."  [AR at 228, 230.]  On July 19, 2010, plaintiff was noted to have a "left-sided incomplete foot drop," and "grade 2 motor function of [the] tibialis anterior on the left," but was also noted to be "doing well," was decreasing his pain medications, and had his pins

---

[7]    The Social Security Administration refers to this as "medical equivalence."  See 20 C.F.R. §§ 404.1526, 416.926.

removed.  [AR at 14, 227.]  Also in July 2010, plaintiff underwent a Doppler study, which indicated peripheral vascular disease of the left lower extremity.  [AR at 14, 274.]  On September 2, 2010, plaintiff was ambulating with a platform walker, and the treatment plan was to continue with physical therapy "now allowing full weight bearing."  [AR at 14, 225.]  On September 24, 2010, after twelve rehabilitation visits, it was observed that plaintiff was "ambulating full weight bearing on the left lower extremity," with a slight trendelenberg gait on the left side, with "some considerable atrophy in the left thigh and left lower extremity."  [AR at 250.]  Plaintiff's motor strength was 3+/5 left gluteus medius, 3+/5 left tibialis anterior, and 5/5 for the rest of the left lower extremity.  [Id.]  There is no mention that plaintiff was either using or needed an assistive device for ambulating.  On November 30, 2010, plaintiff reported to his doctor, Magdi Elsaadi, M.D., that he was unable to return to work due to pain in his left leg, especially when he stands up.  [AR at 14, 265.]  The report noted that plaintiff "walks without a walker or a cane now, but he has a limp and after a short distance he feels pain and fatigue."  [AR at 265.]  On December 17, 2010, plaintiff's neurologist, Dr. Soto, noted that plaintiff "limps and has slight left foot drop when walking."  [AR at 257.]  On January 11, 2011, Dr. Elsaadi's physical examination revealed "an antalgic gait on the left lower extremity with a mild trendelenberg type maneuver."  [AR at 244.]  On January 25, 2011, Dr. Soto again noted plaintiff's limp and slight left foot drop, and recommended temporary disability "at least until June 2011."  [AR at 260.]  On January 27, 2011, Dr. Elsaadi reported that plaintiff "has returned to full weight bearing ambulation," but had a "slight" trendelenberg gait on the left leg, and left foot slap secondary to the peroneal nerve injury.  [AR at 14, 243.]  On May 26, 2011, Dr. Soto stated plaintiff continues to have "difficulty standing, walking, climbing and sitting for prolonged periods and continues to be unable to work due to this. He will continue conservative measures for his pain and weakness, including continuing the exercises at home that he learned in physical therapy."  [AR at 272.]

### 2.    Listings 1.02 and 1.03

As relevant to plaintiff, Listings 1.02 and 1.03 provide as follows:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
. . . .

1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

Listings 1.02, 1.03.

Section 1.00B2b, a necessary finding common to Listings 1.02, 1.03, and 1.04, defines "inability to ambulate effectively":

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Listing 1.00B2b.[8]

---

[8]   Recognizing the seeming inconsistency between 1.00B2b(1) and (2), the Administration has clarified that use of an assistive device limiting functioning of both of a claimant's upper extremities is sufficient, but not necessary, to establish an inability to ambulate effectively according to paragraphs 1 and 2 of section 1.00B2b.  Specifically, the Administration has explained, "We do not want to say that a claimant needs two hand-held assistive devices in order

(continued...)

1    Plaintiff argues that he meets and/or equals the general requirements of Listings 1.02 and

2    1.03.

3    With respect to Listings 1.02 and 1.03, even assuming that the preliminary requirements

4    are met,[9] plaintiff fails to prove the additional necessary requirement that he has an extreme

5    limitation of the ability to walk.

6    Plaintiff testified at the hearing that he has problems with balance and must pay attention

7    to differences in terrain when he walks to ensure that he does not trip [AR at 37, 39], and stated

8    herein that "it was noted several times throughout the medical records that plaintiff was using a

9    walker or a wheelchair to get around." [JS at 5 (citing AR at 225, 229, 230, 250).] A review of the

10   records cited to by plaintiff, however, shows that two of the treatment records were less than a

11   month post-surgery [see, e.g., AR at 229, 230], and one was September 2, 2010 -- three months

12   post-surgery. [AR at 225.] Indeed, on that same date, the orthopedic surgeon cleared plaintiff for

13   full weight-bearing on the left leg. [Id.] The fourth record cited to by plaintiff -- dated September

14   24, 2010 -- actually confirms that plaintiff "is now ambulating full weight bearing on the left lower

15   extremity," and does not mention that a walker, wheelchair, or any other assistive device, is being

16   ────────────────

17       [8](...continued)
     to exhibit inability to ambulate effectively . . . .  The definition requires only that the claimant not

18   be able to ambulate effectively and that effective ambulation would not occur if the only way an
     individual could get around would be with an assistive device that requires use of both upper

19   extremities."  66 Fed. Reg. 58010, 58027 (Nov. 19, 2001).  The Administration has further
     asserted that "[t]he criteria [under 1.00B2b] do not require an individual to use an assistive device

20   of any kind[,]" the "explanation[s] and examples should make it clear that [the section] applies to
     anyone who cannot walk adequately[,]" and "we recognize that individuals with extreme inability

21   to ambulate do not necessarily use assistive devices."  Id. at 58026-27.

22       [9]    Regarding Listing 1.02, plaintiff does not point to any medical evidence in the record to

23   show that his severe impairments as determined by the ALJ meet the requirement for a "gross
     anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability)."  Nor

24   does he point to any "findings . . . of joint space narrowing, bony destruction, or ankylosis of the
     affected joint(s)." [See generally JS at 8-9.]  He merely recites the severe impairments found by

25   the ALJ, states that he has a "major dysfunction involving a major peripheral weight-bearing joint,"
     and then argues that he has an extreme limitation of the ability to walk.  [JS at 8.]  This is

26   insufficient to demonstrate that his impairments meet or medically equal the preliminary
     requirements of Listing 1.02.  The Court notes that regarding Listing 1.03, Dr. Soto noted that

27   plaintiff was "[status post] left hip reconstructive surgery."  [AR at 257 (emphasis added).]

28

1   used or is any longer necessary.[10]   [AR at 250.]   In fact, by October, 20, 2010, Dr. Elsaadi noted

2   that plaintiff walked without a walker or cane.   [AR at 265.]   Similarly, on December 26, 2011, the

3   consultative examiner, Vicente R. Bernabe, D.O., a board certified orthopedic surgeon, noted that

4   plaintiff needed no assistive device and could ambulate on uneven surfaces.[11]   [AR at 316-21.]

5         Plaintiff also testified that he lived alone, drove himself places without difficulty, performed

6   all household chores, went fishing, visited relatives outside of his home, and shopped for

7   groceries.   [AR at 27-28, 39-40.]   The ALJ found plaintiff's activities were not "limited to the extent

8   one would expect, given the complaint of disabling symptoms and limitations."   [AR at 13.]   Plaintiff

9   does not dispute the ALJ's credibility determination.

10         Additionally, plaintiff's left foot drop and/or trendelenberg gait were generally described as

11   "mild" or "slight."   For instance, on December 17, 2010, and again on January 25, 2011, plaintiff's

12   neurologist, Dr. Soto, reported that plaintiff "limps and has *slight* left foot drop when walking"; on

13   May 26, 2011, she stated that he "continues to have dropped foot when walking."   [AR at 257, 259,

14   272 (emphasis added).]   On January 27, 2011, plaintiff's physical therapist reported that plaintiff

15   had a "*slight* trendelenberg gait on the left leg."   [AR at 243 (emphasis added).]   On May 26, 2011,

16   Dr. Soto reported that plaintiff is "[f]lat footed on left when walking . . . [l]oses balance when

17   turning."   [AR at 272.]   Dr. Soto also noted during that visit that a recent MRI showed "nothing that

18

19   _____

20   [10]   Plaintiff may have meant to refer to AR at 251 -- an August 23, 2010, medical note that
     states plaintiff "demonstrate[s] independent ambulation with a walker with a platform for his left
21   upper extremity."   [AR at 251.]   This record, however, was two months post-surgery; and, as
     noted, one month later plaintiff was cleared for full weight-bearing on his left lower extremity.   [AR
22   at 250.]

23   [11]   The Court notes that even if the ALJ had found plaintiff had a work-related limitation
     regarding walking on uneven terrain, such a limitation by itself does not establish an inability to
24   ambulate effectively for purposes of the Listings.   See, e.g., Moreno v. Astrue, 444 Fed. App'x
     163, 164 (9th Cir. 2011) (ALJ's RFC determination that limited claimant to walking on even terrain
25   did not establish inability to ambulate effectively under the Listing); Perez v. Astrue, 831 F.
     Supp.2d 1168, 1176 (C.D. Cal. 2011) (medical opinion that claimant should not walk on uneven
26   terrain did not equate to inability to ambulate effectively); Delavara v. Astrue, 2013 WL 645626,
     at *5 (C.D. Cal. Feb. 20, 2013) (ALJ's finding that uneven ground might affect plaintiff's ability to
27   work did not equate to inability to ambulate effectively).

28

would explain [plaintiff's] current [left leg weakness and numbness]." [Id.] On November 2, 2011, Dr. Elsaadi observed that plaintiff "walks with a limp," and continues to have pain and paresthesia in his left lower extremity. [AR at 331.] On December 26, 2011, consultative examiner Dr. Bernabe stated that plaintiff walked with a "*mild* limp" and has a "*slight* foot drop on the left foot when he walks." [AR at 318 (emphasis added).] He also noted that plaintiff "is unable to toe walk and heel walk," "can perform a semi squat and rise maneuver," "did not use any assistive device to ambulate," and could walk on uneven terrain. [AR at 318, 320.] The State agency physicians, J. Hartman, M.D. and M. Yee, M.D., in January 2012 and May 2012 respectively, both considered plaintiff's foot drop and determined he was able to ambulate effectively. [AR at 50-59, 72-80.] Both opined that plaintiff did not meet or equal Listing 1.06, which pertains to fracture of the femur, tibia, pelvis, or one or more of the tarsal bones, and requires a claimant to be unable to ambulate effectively within twelve months of onset. [AR at 55, 76; see also Listings 1.06, 100B2b.] On February 1, 2012, Dr. Elsaadi reported that plaintiff walks with a limp, and had persistent lower back pain, let hip pain, and pain in the left leg, "especially after walking for a distance or about an hour of activity." [AR at 330.]

Considering the record as a whole, plaintiff has not met his burden of demonstrating that his impairments meet or equal the criteria of Listings 1.02 or 1.03, including the inability to ambulate effectively. Bowen v. Yuckert, 482 U.S. 137, 145-52, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987) (burden is on claimant to produce evidence that his impairment meets a Listing). The ALJ reviewed the medical evidence in detail and correctly found that plaintiff's impairments do not meet or equal either of these listed impairments.

### 3.    Listing 1.04

Listing 1.04 requires a finding of disability for an individual who has a "[d]isorder[] of the spine" such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture," that results in compromise of a nerve root or the spinal cord, and which is accompanied by the additional requirements set forth

1    under section 1.04A, 1.04B, or 1.04C.  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04.  Section 1.04A

2    requires "[e]vidence of nerve root *compression* characterized by neuro-anatomic distribution of

3    pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or

4    muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower

5    back, positive straight-leg raising test (sitting and supine)." Id. § 1.04A (emphasis added).  Section

6    1.04B requires "[s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue

7    biopsy, or by appropriate medically acceptable imaging . . . ." Id. § 1.04B.  Finally, section 1.04C

8    requires "lumbar spinal stenosis resulting in pseudoclaudication, established by findings on

9    appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness,

10   and resulting in an inability to ambulate effectively, as defined in 1.00B2b." Id. at § 1.04C.

11

12                     **a.      Plaintiff Does Not Meet the Requirements of Listing 1.04**

13              Plaintiff contends that he meets Listing 1.04A or 1.04C.[12] [See, e.g., JS at 13 ("All of these

14   requisite impairments and limitations, which the ALJ either ignored, or misrepresented, quantify

15   the Plaintiff's meeting or equaling the criteria of the 1.04 Listing").]  However, to meet a listing, a

16   claimant's impairments must "meet *all* of the specified medical criteria." Sullivan v. Zebley, 493

17   U.S. 521, 530, 110 S. Ct. 885, 207 L. Ed. 2d 967 (1990).  "An impairment that manifests only

18   some of those criteria, no matter how severely, does not qualify." Id.  Here, there simply is no

19   evidence that plaintiff meets all of the requirements of Listing 1.04 in any one subcategory.  There

20   is no evidence of any nerve root compression, or positive straight leg raising tests, sitting and

21   supine -- necessary for meeting the requirements of section 1.04A. [See also discussion supra

22   Part V.A.3.b.] Nor is there any evidence of "lumbar spinal stenosis resulting in pseudoclaudication

23   . . . and . . . in an inability to ambulate effectively" as required by section 1.04C. [See also

24   discussion supra Part V.A.3.b.]  Thus, petitioner fails to show that he meets Listing 1.04(A) or

25

26              [12]    Plaintiff does not appear to contend that section 1.04B is applicable -- indeed, there are no
27   imaging or pathology reports confirming a diagnosis of spinal arachnoiditis. [See generally JS at 11-
     13.]

28

1   1.04(C).

2

3   **b.    Plaintiff Does Not Medically Equal the Requirements of Listing 1.04**

4   Plaintiff also contends that his impairments medically equal Listing 1.04.  He argues that

5   "[a]s evident by plaintiff's significant and probative medical records as well as the ALJ's own

6   findings regarding plaintiff's severe impairment of left spine degenerative disc disease and . . . left

7   foot drop, it is clear that the plaintiff also indeed has difficulty ambulating effectively due to his

8   disorder of the spine." [JS at 12.]  Even assuming that plaintiff's degenerative disc disease "results

9   in compromise of a nerve root or the spinal cord," as required generally by Listing 1.04, plaintiff's

10  claim fails.  Plaintiff conflates the requirements of sections 1.04A and 1.04C in an attempt to

11  demonstrate that his disorder of left spine degenerative disc disease medically equals the

12  requirements of Listing 1.04:

13          Plaintiff has a disorder of the spine as left spine degenerative disc disease resulting
            in compromise of a nerve root or the spinal cord with distribution of pain, limitation
14          in motion of the spine, motor loss accompanied by sensory or reflex loss and
            resulting in the need for changes in position or posture more than once every 2
15          hours and chronic nonradicular pain and weakness as discussed above, and
            resulting in left foot drop causing difficulty in the ability to ambulate effectively,
16          meaning plaintiff has an extreme limitation of the ability to walk; i.e., an impairment
            that interferes very seriously with the individual's ability to independently initiate,
17          sustain, or complete activities for which plaintiff has the inability to walk on uneven
            surfaces.
18

19  [JS at 12-13.]

20  With regard to the requirements of section 1.04A, plaintiff's March 7, 2011, MRI shows only

21  "mild" disc space narrowing throughout the lumbar spine, and "no nerve root impingement."  [AR

22  at 261-62.]  As such, plaintiff provides no evidence of nerve root *compression* as required under

23  1.04A.  Moreover, as previously discussed, in May 2011, plaintiff's neurologist reviewed this MRI

24  and noted that it showed "mild multilevel DJD [degenerative joint disease], [and] nothing that would

25  explain [plaintiff's] current [left leg weakness and numbness]."  [AR at 261-62, 272.]  In December

26  2011, the consultative examiner also found normal range of motion in plaintiff's lumbar spine, with

27  pain at the terminal ranges of motion, and some tenderness in the lower lumbar region; negative

28

straight leg raising bilaterally in the supine and sitting positions; motor strength at 4/5 in the left lower extremity and 5/5 in the right; "decreased cutaneous sensation to the lateral and anterior thigh and at the dorsum of the foot as well as the lateral aspect of the ankle"; and normal reflexes throughout.  [AR at 318, 319.]

With regard to the requirements of 1.04C, even if "left spine degenerative disc disease" was shown to be medically equivalent to "lumbar spinal stenosis" pursuant to 1.04C -- which plaintiff has not demonstrated -- ultimately fatal to plaintiff's argument that his impairments medically equal section 1.04C is the fact that 1.04C requires the inability to ambulate effectively as defined in 1.00B2b and, as discussed above, the record fails to establish that plaintiff is unable to ambulate effectively.

Thus, while there are some objective medical findings that arguably might be minimally related to some of the requirements of Listing 1.04A or 1.04C, plaintiff has failed to demonstrate medical *equivalence*, which requires a showing of "symptoms, signs, and laboratory findings '*at least equal in severity and duration*' to the characteristics of a relevant listed impairment." Tackett, 180 F.3d at 1099 (emphasis added).


### 4.    The ALJ's Findings Regarding Medical Equivalency Were Sufficient

Plaintiff argues that "while plaintiff may not meet all of the requirements for one specific listing, [he] meets several requirements under each of these listings.  Thus, the ALJ should have considered the impairments in combination or at the very least further developed the record with a medical expert present to determine whether plaintiff would equal a listing." [JS at 13-16 (citing Lewis, 236 F.3d at 512, Marcia, 900 F.2d at 176, Beecher v. Heckler, 756 F.2d 693, 694-95 (9th Cir. 1985)).]  He further argues that the ALJ's boilerplate finding that plaintiff did not have an impairment that meets or equals one of the listed impairments is insufficient. [JS at 4-5.] Plaintiff's arguments are unpersuasive.

In Marcia, the Ninth Circuit stated that "in determining whether a claimant equals a listing under step three of the Secretary's disability evaluation process, the ALJ must explain adequately

his evaluation of alternative tests and the combined effects of the impairments." <u>Marcia</u>, 900 F.2d at 176.  Where the ALJ in <u>Marcia</u> concluded merely that "[t]he [plaintiff] has failed to provide evidence of medically determinable impairments that meet or equal the Listings," the Ninth Circuit held that "this finding is insufficient to show that the ALJ actually considered equivalence." <u>Id.</u> (emphasis omitted). <u>Marcia</u> is distinguishable from the instant case, however, because the plaintiff in <u>Marcia</u> had "presented evidence in an effort to establish equivalence." <u>Id.</u>  Here, at the hearing, counsel merely stated the following in her opening statement:

> ATTY:     I may be -- I believe we may be looking at a potential meeting or equaling of 1.04 here.  In accordance with exhibit, let's see, I believe it is 3F is indicating a --
>
> ALJ:       Three did you say?
>
> ATTY:     -- 3F, is indicating a nerve recompression [sic], there's also indications of neuropathy and nerve injuries in 2F and 4F.

[AR at 27.]  Aside from this one comment, however, and apart from the evidence discussed <u>supra</u> and plaintiff's conclusory assertions herein that his impairments medically meet and/or equal Listings 1.02, 1.03, and/or 1.04, plaintiff does not offer any viable theory as to how his impairments combine to medically equal Listings 1.02, 1.03 or 1.04, especially in light of the fact that the evidence fails to demonstrate an inability to ambulate effectively.

Additionally, the ALJ not only found that the evidence did not support a finding that plaintiff has the severity of symptoms required either singly or in combination to meet or equal any medical listing found under Listing 1.00, she also affirmatively stated that "[n]o treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment." [<u>Id.</u>]  In fact, Exhibit 3F, referred to by counsel in her opening statement, never mentions any spinal nerve compression -- as previously discussed that exhibit specifically noted there was no nerve impingement.  [<u>See</u> AR at 257-63.]  Th ALJ's statement reflects that she considered -- and rejected -- plaintiff's claim of medical equivalence in considering the record.  As discussed herein, this finding is supported by substantial evidence in the record.

1   Accordingly, plaintiff has failed to establish that his impairments meet or equal Listings 1.02, 1.03,

2   or 1.04, and the ALJ did not err in concluding that plaintiff's impairments do not meet or equal any

3   listing.  Remand is not warranted on this issue.

4

5   **B.    TREATING PHYSICIAN**

6         **1.    Legal Standard**

7         "There are three types of medical opinions in social security cases:  those from treating

8   physicians, examining physicians, and non-examining physicians." <u>Valentine v. Comm'r Soc. Sec.</u>

9   <u>Admin.</u>, 574 F.3d 685, 692 (9th Cir. 2009); <u>see</u> <u>also</u> 20 C.F.R. §§ 404.1502, 404.1527.  "As a

10  general rule, more weight should be given to the opinion of a treating source than to the opinion

11  of doctors who do not treat the claimant."  <u>Lester</u>, 81 F.3d at 830; <u>Garrison v. Colvin</u>, 759 F.3d

12  995, 1012 (9th Cir. 2014) (citing <u>Ryan</u>, 528 F.3d at 1198); <u>Turner v. Comm'r of Soc. Sec.</u>, 613

13  F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to

14  greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830; <u>Ryan</u>, 528

15  F.3d at 1198.

16        "[T]he ALJ may only reject a treating or examining physician's uncontradicted medical

17  opinion based on clear and convincing reasons."  <u>Carmickle</u>, 533 F.3d at 1164 (citation and

18  quotation marks omitted); <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1066 (9th Cir. 2006).  "Where

19  such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons

20  that are supported by substantial evidence in the record."  <u>Carmickle</u>, 533 F.3d at 1164 (citation

21  and quotation marks omitted); <u>Ryan</u>, 528 F.3d at 1198; <u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1160-61

22  (9th Cir. 2014); <u>Garrison</u>, 759 F.3d at 1012.  The ALJ can meet the requisite specific and

23  legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting

24  clinical evidence, stating his interpretation thereof, and making findings."  <u>Reddick</u>, 157 F.3d at

25  725.  The ALJ "must set forth his own interpretations and explain why they, rather than the

26  [treating or examining] doctors', are correct."  <u>Id.</u>

27

28

                                              17

1          **2.      Analysis**

2          Dr. Soto treated plaintiff three times -- on December 17, 2010, January 25, 2011, and May

3    26, 2011.  [AR at 15 (citing AR at 257-263, 272).]  Plaintiff contends that the ALJ failed to state

4    whether she accepted Dr. Soto's opinion that plaintiff should "be found temporarily disabled until

5    June 2011," and also failed to mention Dr. Soto's subsequent May 2011 report that stated plaintiff

6    was continuing to have difficulty standing, walking, climbing, and sitting for prolonged periods, and

7    "continues to be unable to work due to this."  [JS at 24 (citing AR at 272).]  Plaintiff contends,

8    therefore, that the ALJ failed to provide specific and legitimate reasons for "rejecting plaintiff's

9    treating physician's opinion."  [Id.]

10         Specifically, the ALJ gave Dr. Soto's opinion "some weight":

11         Dr. Soto treated the claimant several times in late 2010 and early 2011.  During this
           time the claimant underwent a series of tests including an MRI of the lumbar spine.
12         This test indicates a 2-3 mm retrolisthesis of L4 and L5 and a 2 mm retrolisthesis of
           L3 and L4.  A 3 mm disc osteophyte was indicated at L5-S1, a 3 mm osteophyte
13         complex was indicated at L4-L5, and a 3 mm osteophyte complex was indicated at
           L3-L4.  Dr. Soto diagnosed the claimant with left common peroneal nerve with
14         subsequent left foot drop and partial reinervation.  Dr. Soto also noted the claimant
           had incomplete innervation of his muscles, and she recommended the claimant be
15         found temporarily disabled until June of 2011.  Although the doctor stated that the
           claimant is 'disabled,' it is not clear that the doctor was familiar with the definition of
16         'disability' contained in the Social Security Act and regulations.  Specifically, it is
           possible that the doctor was referring solely to an inability to perform the claimant's
17         past work, which is consistent with the conclusions reached in this decision.

18   [AR at 15 (citations omitted).]

19         Thus, the ALJ rejected Dr. Soto's disability opinion because there is no evidence that she

20   was familiar with the definition of disability and because it was "possible" that Dr. Soto was

21   referring solely to plaintiff's inability to perform his past work.  [Id.]  Although the ultimate legal

22   conclusion as to whether a claimant is disabled under the Social Security Act is an issue reserved

23   to the Commissioner, the ALJ is still required to consider, and give legally sufficient reasons for

24   rejecting, a treating physician's subjective judgments about a claimant's ability to work.  See

25   Reddick, 157 F.3d at 725 (explaining that a physician may render "medical, clinical opinions" or

26   opinions on the ultimate issue of disability, and that the reasons required to reject a treating

27   doctor's opinion as to disability are comparable to those required for rejecting a medical opinion);

28

1    Lester, 81 F.3d at 832-33 ("The Commissioner is required to give weight not only to the treating

2    physician's clinical findings and interpretation of test results, but also to his subjective judgments.

3    . . . The treating physician's continuing relationship with the claimant makes him especially

4    qualified to . . . form an overall conclusion as to functional capacities and limitations, as well as

5    to prescribe or approve the overall course of treatment."). Here, it is of course possible that when

6    Dr. Soto recommended "temporary disability" [AR at 260], and later stated that plaintiff "continues

7    to be unable to work" due to his symptoms [AR at 272], she only meant that plaintiff was unable

8    to perform his past work. However, because she did not suggest that there was any other work

9    plaintiff could perform, it is equally possible that she was *not* referring only to that past work. The

10   ALJ was not entitled to exploit what was at best a slight ambiguity in this respect and engage in

11   pure speculation as to Dr. Soto's intended meaning without making any attempt to clarify the basis

12   for Dr. Soto's opinion.

13        Defendant argues that the ALJ was entitled to give more weight to the opinions of Dr.

14   Bernabe and the State agency consultants [AR at 27-29] and, although the ALJ rejected Dr. Soto's

15   opinion of disability, the ALJ still "adopted an accommodating RFC, which took into account

16   Plaintiff's severe impairments. . . ." [JS at 30.] Defendant also notes that although Dr. Soto stated

17   that plaintiff "continued to have difficulty running, climbing, standing, and sitting . . . , there are no

18   associated objecti[ve] testing or findings to support these notations." [Id. (citing AR at 272).]

19   Defendant additionally contends that Dr. Soto's finding "appears to be based on Plaintiff's

20   subjective symptom reports, which the ALJ found not fully credible, a finding that Plaintiff does not

21   challenge." [JS at 31 (citations omitted).] Finally, defendant notes that "Plaintiff's reports

22   elsewhere in the record contradict these findings," and his testimony demonstrates that he

23   performs "activities that surpass the functionality reflected in Dr. Soto's notation." [Id. (citations

24   omitted).]

25        Each of these reasons may be a specific, legitimate reason for giving more weight to the

26   opinions of Dr. Bernabe and the State agency consultants and less weight to the opinion of Dr.

27   Soto. Significantly, however, these reasons were not articulated by the ALJ in her explanation of

28

the weight given to Dr. Soto's opinions.  The Court is constrained to review only the reasoning asserted by the ALJ, and cannot consider post hoc reasoning by defendant, or even the evidence upon which the ALJ could have relied.  Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (noting that a reviewing court "is constrained to review the reasons the ALJ asserts" and finding error were the ALJ affirmed the ALJ's decision "based on evidence that the ALJ did not discuss") (citing Pinto v. Massanari, 249 F.3d 840, 847-48 (9th Cir. 2001)); Jonker v. Astrue, 725 F. Supp. 2d 902, 911 n.7 (C.D. Cal. 2010).  The Ninth Circuit has explained that the Court cannot engage in "post hoc rationalizations that attempt to intuit what the [ALJ] might have been thinking," and cannot affirm on rationale that was not articulated by the ALJ.  Bray v. Comm'r, 554 F.3d 1219, 1229 (9th Cir. 2009).

Accordingly, because the reasons identified by defendant were not articulated by the ALJ, and the only reason identified by the ALJ was not specific and legitimate, the Court cannot find the ALJ identified specific, legitimate reasons supported by substantial evidence for rejecting the opinion of Dr. Soto.  Remand is warranted on this issue.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  See Lingenfelter v. Astrue, 504 F.3d 1028, 1041 (9th Cir. 2007); Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  See Benecke, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made.  In an effort to expedite these proceedings and to avoid any confusion or

misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings.  First, because the ALJ failed to provide specific and legitimate reasons for discounting the opinion of Dr. Soto, the ALJ on remand shall reassess the opinions of this physician, clarifying if necessary Dr. Soto's opinion of disability.  In assessing the medical opinion evidence, the ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of the opinion that the ALJ discounts or rejects, including a legally sufficient explanation for crediting one doctor's opinion over any of the others.  Finally, if warranted, the ALJ shall reassess plaintiff's RFC and determine, at steps four and five, with the assistance of a VE if necessary, whether plaintiff is capable of performing his past relevant work as a property manager as generally performed, and/or whether there are alternative jobs existing in significant numbers in the national economy that plaintiff can still perform.

**VII.**

**CONCLUSION**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  March 10, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE